# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIFFANY TOMASSI, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-1354 |
| | ) | |
| v. | ) | Judge Mark R. Hornak |
| | ) | Magistrate Judge Maureen P. Kelly |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | Re: ECF Nos. 11, 16 |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the Court grant in part and deny in part Plaintiff's Motion for Summary Judgment (ECF No. 11), deny Defendant's Motion for Summary Judgment (ECF No. 16), and vacate the decision of the administrative law judge ("ALJ").

## II. REPORT

### A.   BACKGROUND

#### 1. Procedural History

Tiffany Tomassi ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f (the "Act").  Plaintiff filed for benefits claiming an inability

to work due to disability beginning June 29, 2009.  (R. at 182 – 92, 245).[1]  Plaintiff's alleged disabling impairments included bipolar disorder, general anxiety, post-traumatic stress disorder, hepatitis C, and seizures.  (R. at 262).  Having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment.  (ECF Nos. 11, 16).

### 2. Personal Background

Plaintiff was born on December 22, 1979, was thirty one years of age at the time of her application for benefits.  (R. at 30, 182 – 92, 245).  Plaintiff graduated from high school, but did not pursue post-secondary education or vocational training.  (R. at 263).  Plaintiff's work history included employment as a cashier, office worker, typist, and hostess.  (R. at 272, 322 – 23).  Plaintiff also had a criminal history.  In 2010, she was charged with identity theft following the use of her sister's identification while driving.  (R. at 639).  Plaintiff subsequently moved to California to live with her father from May through September 2010.  (R. at 639).  She then returned to Pennsylvania, turned herself in to authorities, and was incarcerated for approximately forty six days ending in October 2010.  (R. at 37, 639).  She was on probation until October 2012.  (R. at 37).  At the time of her administrative hearing on December 20, 2011, she was facing criminal charges for simple assault, disorderly conduct, and criminal mischief.  (R. at 45, 639 – 40).  Plaintiff was living with her grandmother and twelve year old daughter.  (R. at 45).  She and her daughter subsisted on welfare benefits.  (R. at 45).

### 3. Treatment History

When Plaintiff was incarcerated at the Allegheny County Jail, an Inmate Medical Survey Report was completed on September 7, 2010.  (R. at 412).  Plaintiff was noted to have a history of heroin and benzodiazepine abuse, which she asserted had ended in July 2009.  (R. at 413).

---

[1]     Citations to ECF Nos. 8 – 8-16, the Record, *hereinafter*, "R. at __."

Plaintiff also had a history of bipolar disorder and anxiety disorder, but had not taken prescribed psychiatric medications for several months. (R. at 414). Plaintiff was observed to be neat and clean, calm and cooperative, and alert and oriented. (R. at 414). A Psychiatric Evaluation was completed by Allegheny Correctional Health Services on October 5, 2010. (R. at 410 – 11). Plaintiff was observed to have a normal appearance, relevant and coherent speech, intact memory, intense and depressed affect, normal thoughts and perceptions, average intelligence, intact judgment, and limited insight. (R. at 410). Plaintiff was diagnosed with bipolar disorder, polysubstance abuse in remission, post-traumatic stress disorder, generalized anxiety disorder, and panic disorder. (R. at 411). Her global assessment of functioning[2] ("GAF") score was between 35 and 40. (R. at 411).

Plaintiff was examined by former primary care physician Paul G. Tepe, M.D. on December 1, 2010 after having not been seen in three years. (R. at 455). Plaintiff reported to Dr. Tepe that she had issues with bipolar disorder and anxiety, but that she had been placed on prescription medications since her release from jail and her symptoms had stabilized. (R. at 455). Plaintiff also complained of headache pain once or twice per month. (R. at 455). She reported maintaining abstinence from substance abuse. (R. at 455). Dr. Tepe observed Plaintiff to appear "well." (R. at 455). He diagnosed bipolar disorder and headaches, at baseline. (R. at 455).

Plaintiff was evaluated by a physician at Dr. Tepe's practice on March 9, 2011. (R. at 463 – 64). Plaintiff had an appointment with Dr. Tepe in two weeks, but appeared at his offices

---

[2]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *Id.*

for complaints of abdominal pain and diarrhea. (R. at 463). Plaintiff also reported that she experienced bipolar depression, but had run out of medication because she had not been seeing her psychiatrist. (R. at 463). Plaintiff was diagnosed with pelvic inflammatory disease and bipolar depression. (R. at 464). She was advised to see her psychiatrist or go to UPMC Western Psychiatric Institute and Clinic for an evaluation. (R. at 464).

On March 21, 2011, Plaintiff appeared at UPMC Western Psychiatric Institute and Clinic ("Western Psych") in Pittsburgh, Pennsylvania, to commence outpatient medication management for her psychiatric disorders. (R. at 488 – 500). Plaintiff was evaluated by Timothy Denko, M.D. and Keith Stowell, M.D. Plaintiff informed the doctors that she had not taken prescribed medications since November 2010. (R. at 488). She had not seen a psychiatrist in some time, and her primary care physician was not comfortable prescribing psychiatric medications. (R. at 498). Plaintiff complained of bipolar symptoms of depression and mania. (R. at 488). She reported worsening anxiety attacks. (R. at 498). Plaintiff also acknowledged a history of substance abuse. (R. at 488).

Plaintiff was observed to be tearful and anxious, but reactive and appropriate with a full range of affect. Dr. Denko indicated that her speech was normal; Dr. Stowell indicated that her speech was loud, but normal, her thoughts were reasonable, logical, and organized, she had no perceptual disturbances, she was oriented, her attention and concentration were grossly intact, she made good eye contact, her memory was good, her insight was limited with respect to her substance abuse, but was otherwise fair, her judgment was fair, and she was without suicidal ideation. (R. at 491, 498 – 99). Plaintiff also appeared capable of caring for her basic needs, and was working as a hostess at that time. (R. at 498 – 99). Plaintiff was diagnosed with anxiety disorder, NOS, panic disorder, without agoraphobia, and mood disorder, NOS. (R. at 495). Her

GAF score was 50[3].  (R. at 496).  Dr. Denko was not convinced that Plaintiff suffered from bipolar disorder, and believed that her substance abuse was only in partial remission.  (R. at 497).  Psychiatric medications were prescribed.

On March 22, 2011, Plaintiff returned to neurologist Pushpa Kumari, M.D. for treatment of seizure disorder and headache pain following a hiatus since November 2009.  (R. at 599 – 608).  Plaintiff reported no seizure activity for the last twelve months.  (R. at 599).  Plaintiff complained of headaches several times per week, associated with nausea, light and sound sensitivity, and vomiting.  (R. at 599).  Ibuprofen provided short-term relief.  (R. at 599).  Upon examination, Dr. Kumari noted Plaintiff to have full strength, normal, painless range of motion in all muscle groups and joints, an abnormal EEG, and a normal MRI of the brain.  (R. at 601).  Plaintiff was alert and oriented, she had intact memory, and her insight and judgment were good.  (R. at 601).  Plaintiff was placed on prescription medication for treatment

On April 13, 2011, Plaintiff was examined by Madhavi Davuluri, M.D. for purposes of establishing a new primary care physician.  (R. at 526 – 30).  Plaintiff denied alcohol use, but acknowledged use of marijuana.  (R. at 527).  Plaintiff complained of fatigue, depression, and anxiety, but denied suicidal ideation.  (R. at 528).  Plaintiff also complained of parathesias and seizures, but made no mention of migraines.  (R. at 528).  Dr. Davuluri observed Plaintiff to be obese, to be in no acute distress, to be fully oriented, and to exhibit appropriate mood and affect.  (R. at 529).  Plaintiff's current issues were indicated to be a right-sided breast mass, hepatitis C, hypothyroidism, morbid obesity, stable seizure disorder, smoking, bipolar disorder, hemorrhoids, and post-traumatic stress disorder.  (R. at 530).

---

[3]       An individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

On April 18, 2011, Plaintiff presented at Western Psych for an initial medication management evaluation. (R. at 692 – 98). She was to begin her treatment with Amy Meadows, M.D. Plaintiff was thirty one years of age at the time, and was noted to have a long history of mood instability, bipolar disorder, anxiety, and substance abuse. (R. at 692). The substance abuse was considered to be in remission. (R. at 692). Plaintiff described experiencing mental health issues since she was a teenager. (R. at 692). She complained of sadness, anxiety, racing thoughts, difficulty sleeping, episodes of mania, physical health issues, and the loss of custody of her daughter. (R. at 692). Plaintiff reported living alone, maintaining friendships, having a close relationship with two sisters, and receiving support and help from a sympathetic ex-boyfriend. (R. at 692).

Dr. Meadows observed Plaintiff to exhibit moderate sadness, mild hypersomnia, moderate concentration, moderate restlessness, no passive death wish/suicidal ideation, and severe issues with energy, self-esteem, and interest. (R. at 693). Plaintiff was occasionally tearful. (R. at 694). However, Plaintiff was alert, oriented, and clean in appearance, her speech was normal, her affect was congruent and full, her memory, concentration, and attention were intact, her thoughts were logical and linear, she had no deficits in cognitive functioning, and her insight and judgment were good. (R. at 694). Plaintiff had been out of psychiatric care since November 2010, but indicated that medication for mood stabilization had helped her in the past. (R. at 692, 696). Dr. Meadows started Plaintiff on a number of psychiatric medications. (R. at 696). Plaintiff was also to begin individual and group therapy.

On April 21, 2011, Plaintiff returned to see Dr. Kumari. (R. at 595 – 98). Plaintiff still complained of headaches several times per week. (R. at 595). Associated symptoms remained the same. (R. at 595). There were no exacerbating factors, and prescribed medication had

significantly improved Plaintiff's pain. (R. at 595, 597). Upon examination, Plaintiff's strength and range of motion were normal and without pain. (R. at 597). Plaintiff was in no distress, was alert and oriented, had intact memory, and had good insight and judgment. (R. at 597). Repeat EEG testing and MRI of the brain were normal. (R. at 597). Plaintiff was "doing well." (R. at 597).

Plaintiff next visited her primary care physician, Dr. Davuluri, on April 25, 2011, in part, for the purpose of completing forms for her disability application. (R. at 548). Plaintiff complained to Dr. Davuluri that she could not handle jobs "due to mental health issues, rather than physical illness except the fatigue." (R. at 548). Plaintiff was not working at the time, and claimed that she was frequently forced to change jobs for psychological reasons. (R. at 548). Dr. Davuluri felt that Plaintiff's ability to work was mostly affected by fatigue, knee and shoulder pain, anxiety, and depression. (R. at 550).

On May 16, 2011, Plaintiff returned for a follow-up with Dr. Meadows for her medications. (R. at 685 – 89). Plaintiff complained of increased anxiety, poor concentration, racing thoughts, irritability, and sleep disturbance, and Dr. Meadows observed that her speech was fast and somewhat loud. (R. at 685). Plaintiff had been experiencing significant turmoil in her personal life. (R. at 685). Plaintiff exhibited moderate sadness, mild hypersomnia, moderate concentration, moderate restlessness, no passive death wish/suicidal ideation, and severe issues with energy, self-esteem, and interest. (R. at 686). Plaintiff was occasionally tearful. (R. at 687). However, Plaintiff was alert, oriented, and clean in appearance, her speech was normal, her affect was congruent and full, her memory, concentration, and attention were intact, her thoughts were logical and linear, she had no deficits in cognitive functioning, and her insight and judgment were good. (R. at 687). Plaintiff's diagnoses included bipolar disorder with moderate

depression, anxiety disorder, NOS, and opioid dependence. (R. at 688). Plaintiff's medications were adjusted and increased. (R. at 689).

On May 19, 2011, Plaintiff had a follow-up appointment with Dr. Kumari. (R. at 591 – 94). Dr. Kumari indicated that Plaintiff experienced a severe migraine once or twice per month, and sharp head pain once or twice per week. (R. at 591). Associated neurologic symptoms remained the same. (R. at 591). Plaintiff continued to see improvement with medication. (R. at 591). Physical examination revealed full strength and range of movement. (R. at 593). Plaintiff was alert and oriented, had intact memory, had good insight and judgment, and was in no distress. (R. at 593). Plaintiff was doing "fairly well," and her headaches were considered to be "fairly stable." (R. at 593).

On May 23, 2011, Plaintiff was admitted to the emergency department of Saint Clair Hospital in Pittsburgh, Pennsylvania, as a result of a fall related to a seizure. (R. at 557). Plaintiff hit the back of her head. (R. at 557). She reported only a mild headache. (R. at 557). A physical examination revealed Plaintiff to be in no acute distress, but anxious. (R. at 558). A CT scan of Plaintiff's head was normal. (R. at 558). Plaintiff had another seizure while in the hospital, but it was not accompanied by seizure-like activity other than confusion. (R. at 560). Plaintiff's diagnoses of seizure disorder, bipolar disorder, obesity, and migraine headaches were noted. (R. at 561 – 62). Plaintiff stated that she experienced two migraines per week. (R. at 561). She was provided prescription medication for migraines. (R. at 562).

At a neurological consultation on May 24, 2011, Plaintiff's migraines were considered to be poorly controlled. (R. at 563). Plaintiff claimed that prescription medication for migraines had not been helpful. (R. at 563). She complained of a severe, throbbing headache at the time of the examination, with attendant light sensitivity. (R. at 564). Plaintiff had been taking

prescription Topomax for her migraines, but at a dosage too low to be effective. (R. at 565). Plaintiff's prescription medications were adjusted to better control her seizures and migraines. (R. at 565). An EEG of the brain was normal. (R. at 566).

At a follow-up appointment with her primary care physician on June 1, 2011, subsequent to her hospitalization for seizures, it was indicated that Plaintiff had not experienced a seizure or migraine episode since her admission. (R. at 569). Plaintiff was in no acute distress and interacted normally. (R. at 571). Plaintiff was "doing well." (R. at 571).

Dr. Meadow's evaluated Plaintiff again on June 13, 2011. (R. at 679 – 83). Plaintiff described significant environmental stressors including hospitalization for seizures, a need to care for her injured grandmother, attempting to regain custody of her daughter, and being evicted from her apartment. (R. at 679). Plaintiff experienced frequent tearfulness, difficulty sleeping, anxiety, guilt, loss of concentration, low mood, and restlessness. (R. at 679). Dr. Meadows observed Plaintiff to have moderate sadness, moderate concentration, moderate self-esteem, moderate energy level, mild restlessness and psychomotor retardation, and severe loss of interest. (R. at 680). However, Plaintiff was alert, oriented, and clean in appearance, her speech was normal, her affect was congruent and full, her memory, concentration, and attention were intact, her thoughts were logical and linear, she had no deficits in cognitive functioning, and her insight and judgment were good. (R. at 681). Plaintiff's diagnoses remained the same, and her medications were adjusted.

On July 11, 2011, Plaintiff attended her first medication management session at Western Psych with psychiatrist Dr. David Massey. (R. at 672 – 74). Dr. Massey observed Plaintiff to be alert, cooperative, clean, and casually dressed. (R. at 674). Speech was normal, memory, concentration, and attention were intact, thought was logical and linear, insight was good,

judgment was fair, and cognitive function was without deficits. (R. at 674). Plaintiff's mood was sad, and her affect was congruent, labile, and full. (R. at 674). She claimed to be impulsive, but denied suicidal ideation and hallucinations. (R. at 674). She reported mood instability, depression, poor concentration, anhedonia, low energy, and anxiety. (R. at 672). Dr. Massey prescribed medication.

On July 12, 2011, Plaintiff was examined by her neurologist, Dr. Kumari. (R. at 587 – 90). Plaintiff's hospitalization related to her seizure disorder was noted. (R. at 587). Plaintiff was also still experiencing one or two severe migraines per month, and sharp head pain once or twice per week. (R. at 587). Plaintiff's headaches were still noted to be improved. (R. at 587). Plaintiff was observed to be in no distress, she was alert and oriented, she had intact memory, and she had good insight and judgment. (R. at 589). She had full strength and normal range of motion, without pain. (R. at 589). She was to undergo further testing to determine the reason for her most recent seizure activity. (R. at 589).

Plaintiff attended group therapy at Western Psych on August 1, 2011. (R. at 670). Plaintiff was attentive, and actively and appropriately participated in discussion. (R. at 670). Plaintiff was able to learn coping strategies. (R. at 670). Plaintiff was similarly engaged in subsequent group therapy sessions. (R. at 649 – 50, 657 – 58, 660, 668).

On August 8, 2011, Dr. Massey evaluated Plaintiff for another medication check. (R. at 662 – 66). At the time, Plaintiff resided with her grandmother and was caring for her sister's children. (R. at 662). She complained of mood instability, depression, anxiety, poor concentration, anhedonia, low energy, and poor sleep. (R. at 662). Plaintiff kept in touch with friends, was close with her two sisters, and had a supportive ex-boyfriend who sometimes helped with her bills. (R. at 662). Dr. Massey observed Plaintiff to exhibit moderately sad mood,

moderate concentration, mild passive death wish/suicidal ideation, moderate energy, mild restlessness, and severe issues with self-esteem and interest. (R. at 663). Plaintiff appeared to be somewhat anxious, but was alert and cooperative, had normal speech, had congruent, reactive, and broad affect, had intact memory, concentration, and attention, had logical and linear thought, had good insight, and had good judgment. (R. at 664). Plaintiff's diagnoses were polysubstance dependence, bipolar I disorder with moderate depression, and anxiety disorder. (R. at 665 – 66). Her medications were adjusted.

On August 29, 2011, Dr. Massey again evaluated Plaintiff for medication management. (R. at 651 – 56). Her complaints were unchanged. It was suggested that she become more active with Narcotics Anonymous ("NA"). (R. at 651). She continued to stay in touch with supportive friends from NA, remained close with her sisters, and received help and support from an ex-boyfriend. (R. at 651). Dr. Massey observed Plaintiff to have moderately sad mood, moderate concentration, mild passive death wish/suicidal ideation, moderate energy, mild restlessness, and severe issues with self-esteem and interest. (R. at 652). Plaintiff's speech was normal, her affect was congruent, reactive, and broad, she was oriented, her memory, attention, and concentration were intact, her thought was logical and linear, and her insight and judgment were good. (R. at 653). Her diagnoses remained the same.

On August 30, 2011, Dr. Kumari conducted another neurological examination of Plaintiff. (R. at 583 – 86). Her headaches were noted to be a weekly occurrence. (R. at 583). Headaches had improved with medication; although medication allegedly caused some sleepiness. (R. at 583). Upon examination, Plaintiff was noted to be alert and oriented, with intact memory and good insight and judgment. (R. at 585). Range of motion was pain-free in all major joints and muscle groups. (R. at 585). Plaintiff also had full strength. (R. at 585). EEG

monitoring had, again, been normal.  (R. at 586).  Dr. Kumari recommended Plaintiff to seek treatment at the AGH Epilepsy Center for further study of her seizures.  (R. at 586).

On October 3, 2011, Plaintiff appeared at Western Psych for medication management, and was now under the care of Julie Poulin, M.D.  (R. at 641 – 46).  Plaintiff reported taking care of her daughter and grandmother.  (R. at 641).  She reported increased stress, worsening mood swings, irritable mood, and shoplifting due to lack of money.  (R. at 641).  She was tearful during her interview.  (R. at 641).  She refused the suggestion to increase her medication.  (R. at 641).  Plaintiff was observed to be moderately sad, she had moderate concentration, she had moderate energy, she had mild restlessness, she had mild passive death wish/suicidal ideation, and she had severe issues with self-esteem and interest.  (R. at 642).  Dr. Poulin indicated that Plaintiff's speech was normal, her affect was congruent, reactive, and broad, her memory, concentration, and attention were intact, her thought was logical and linear, and her insight and judgment were good.  (R. at 644).  Plaintiff's diagnoses remained the same.

On October 28, 2011, Plaintiff was referred to Western Psych's Intensive Outpatient Program due to recent difficulty stabilizing her mood and anxiety.  (R. at 639).  She had frequently been missing her regular outpatient appointments.  (R. at 639).  Plaintiff's complaints were noted to be depressed mood, increased anxiety and worry, and hypersomnia.  (R. at 639).  She denied suicidal ideation.  (R. at 639).  Plaintiff had recently been charged with criminal conduct following a violent altercation with a man who allegedly attempted to sexually assault her.  (R. at 639 – 40).  Plaintiff was scheduled to begin intensive outpatient therapy for bipolar disorder in November 2011.  (R. at 640).

### 4. Functional Capacity Assessments

Plaintiff's case was evaluated by two state agency medical professionals. (R. at 57 – 64). On May 4, 2011, state agency evaluator Jan Melcher, Ph.D., completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. at 62 – 64). She concluded that Plaintiff was no more than moderately limited in all areas of functioning. (R. at 62 – 64). She considered Plaintiff to be only partially credible. (R. at 62 – 64). Based upon her review of the record, Dr. Melcher concluded that Plaintiff could work in production oriented jobs requiring little independent decision making and no complicated tasks. (R. at 62 – 64).

On May 5, 2011, state agency evaluator Paul Reardon, M.D., completed a Physical RFC of Plaintiff. (R. at 59 – 61). He assessed Plaintiff's limitation stemming from seizures, hepatitis C, hypothyroidism, obesity, and knee pain. (R. at 59 – 61). He noted that Plaintiff's conditions were stable with conservative treatment. (R. at 59 – 61). He opined that Plaintiff could occasionally lift and carry fifty pounds, frequently lift and carry twenty-five pounds, stand and walk for six hours of an eight hour work day, and sit about six hours. (R. at 59 – 61). She could never climb ropes, ladders, or scaffolds, and would need to avoid heights and machinery. (R. at 59 – 61). In light of Plaintiff's activities of daily living, Dr. Reardon concluded that Plaintiff was only partially credible. (R. at 59 – 61).

On June 25, 2011, Dr. Davuluri, Plaintiff's primary care physician, completed a Medical Statement Regarding Social Security Disability Claim relative to Plaintiff. (R. at 523 – 25). Plaintiff's diagnosed impairments were noted to be bipolar disorder, right knee strain, and migraine. (R. at 523). Plaintiff received medications for these conditions. (R. at 523). At her last examination, Plaintiff was noted to be obese, she was anxious, and she had mild headache pain. (R. at 523). Based upon this medical history, Dr. Davuluri considered Plaintiff to have no

ability to work in any capacity. (R. at 523). Dr. Davuluri's specific limitations findings included the ability to only occasionally lift two to three pounds, stand and walk only one or two hours of an eight hour work day, limited pushing and pulling with the right upper and both lower extremities, only occasional climbing, no bending, kneeling, stooping, or crouching, and no exposure to temperature extremes or noise. (R. at 524 – 25).

On June 27, 2011, Dr. Meadows, one of Plaintiff's treating psychiatrists at Western Psych, completed a Medical Assessment of Ability to do Work – Related Activities (Mental) on Plaintiff's behalf. (R. at 576 – 78). In it, Dr. Meadows indicated that Plaintiff's diagnoses included bipolar I, depressed, in partial remission, seizures, and hypothyroidism. (R. at 578). Plaintiff's GAF score at that time was 48,[4] and her highest in the past year had been 55.[5] (R. at 578). Dr. Meadows had treated Plaintiff monthly between April and June 2011. (R. at 578). Dr. Meadows was concerned about Plaintiff's ability to function in high stress work conditions. (R. at 576). She opined that Plaintiff had poor or no ability to use judgment, interact with supervisors, deal with work stress, function independently, maintain attention and concentration, understand, remember, and carry out complex job instructions, behave in an emotionally stable manner, and relate predictably in social situations. (R. at 577). She would be able to manage her own benefits, however. (R. at 577).

On July 13, 2011, Dr. Davuluri completed a second Medical Statement Regarding Social Security Disability Claim on Plaintiff's behalf. (R. at 579 – 82). Plaintiff's diagnosed impairments included bipolar depression, migraines, seizure disorder, and right knee pain. (R. at

---

[4]     As previously noted, an individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

[5]     An individual with a GAF score of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

579). As a result, Dr. Davuluri believed that Plaintiff could only occasionally lift and carry less than ten pounds, could stand and walk no more than two hours of an eight hour work day, could sit less than six hours, could push and pull with the lower extremities to a limited degree, could never climb, balance, stoop, kneel, crouch, and crawl, could only engage in limited reaching, handling, and dexterous movements, and would need to avoid poor ventilation, heights, moving machinery, vibration, temperature extremes, and chemicals. (R. at 580 – 81). Dr. Davuluri opined that Plaintiff experienced moderate pain requiring her to frequently elevate her legs, and fatigue requiring rest periods during the day. (R. at 580). Additionally, Dr. Davuluri felt that Plaintiff experienced marked restriction in activities of daily living, social functioning, maintaining concentration, persistence, and pace, and completion of tasks in a timely manner. (R. at 582).

### 5. Administrative Hearing

Plaintiff testified that she had last engaged in drug and alcohol use in August 2009. (R. at 33). In an effort to maintain sobriety, she participated in rehabilitation programs in 2009 and 2010, which included stays at a "halfway house" and "recovery homeless shelter." (R. at 33). During this period, Plaintiff had voluntarily relinquished custody of her daughter to the biological father. (R. at 34). Following her time in treatment, Plaintiff sought, and succeeded in receiving, full custody of her daughter. (R. at 34 – 35).

At the time of the hearing, Plaintiff and her daughter resided with Plaintiff's grandmother. (R. at 43 – 44). Although Plaintiff had moved in with her grandmother to help care for her, she stated that she was rather lax with respect to grocery shopping, cooking, cleaning, and performing other household chores. (R. at 43). Plaintiff believed that it was a bad

idea to move in with her grandmother, because she felt unable to provide the level of help that her grandmother needed.  (R. at 44).

Plaintiff explained to the ALJ that she was engaged in an intensive outpatient treatment program and group therapy for her psychological issues.  (R. at 39).  She attended treatment approximately three times per week at Western Psych.  (R. at 39).  Plaintiff had missed some treatment, and was hoping to reduce the number of days per week, because caring for her daughter interfered with her treatment schedule.  (R. at 40).  Plaintiff also indicated that she lacked motivation.  (R. at 40).  Plaintiff testified that she had recently gone through a manic phase of her bipolar disorder that resulted in a violent altercation and criminal charges.  (R. at 41 – 42, 45).  Her manic episodes had apparently been increasing.  (R. at 44).  She was easily distracted and had difficulty sleeping.  (R. at 44).

Plaintiff claimed that she suffered severe migraines two or three time a week, and that a migraine typically persisted for two or three days.  (R. at 36).  In conjunction with her depression, Plaintiff's migraines relegated her to spending most days in bed.  (R. at 36, 38). Plaintiff described experiencing sensitivity to light and sound, as well as an increase in anxiety during migraine episodes.  (R. at 39).  However, Plaintiff testified that she would attend therapy even when suffering migraine pain.  (R. at 40).

Plaintiff stated that she only associated with one of her sisters and avoided former social contacts, because her old friends were involved in unhealthy drug abuse lifestyles.  (R. at 40 – 41, 46).  Plaintiff also claimed that she had difficulty getting along with others because of her mental health issues, and because she was "hard to deal with."  (R. at 42).  Plaintiff had recently attempted part-time work, but was not able to sustain it due to frequently calling off, gossiping,

leaving work early, and having panic attacks. (R. at 42 – 43). Plaintiff mentioned that she also had aggression and anger issues. (R. at 43).

Following Plaintiff's testimony, the ALJ asked the vocational expert to characterize Plaintiff's past relevant work. (R. at 47). The vocation expert explained that Plaintiff's former positions included work as a "cashier II:" a light, unskilled position; as a "telephone operator:" a sedentary, semi-skilled position; as a "typist:" a sedentary, semi-skilled position; and as a "general clerk:" a light, semi-skilled position. (R. at 47). The ALJ then inquired whether a hypothetical person of Plaintiff's age, educational level, and work experience, could engage in any of the above occupations if limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions and routine workplace changes, and involving isolation from the public and only occasional interaction with supervisors and co-workers. (R. at 47).

The vocational expert responded that such a person could work as a typist or telephone operator. (R. at 38). The ALJ next asked whether such a person would be eligible for any other work existing in significant numbers in the national economy. (R. at 48). The vocational expert replied that such a person could work as an "agricultural produce packer," with 58,000 positions available in the national economy, as an "industrial cleaner," with 142,000 positions available, or as a "retail marker," with 49,000 positions available. (R. at 49).

The ALJ asked whether jobs would still be available if the hypothetical person was also limited to only occasional use of stairs and ramps, and no use of ladders, ropes, or scaffolds, and no exposure to unprotected heights and moving machinery. (R. at 48). Of the above-mentioned jobs, the vocational expert stated that the hypothetical person could still work as a typist, telephone operator, and retail marker. (R. at 48). Additionally, such a person could work as a

"housekeeping/cleaner," with 165,000 positions available in the national economy, or as a "photocopying machine operator," with 31,000 positions available. (R. at 49).

The ALJ asked whether jobs would be available if the hypothetical person had no ability to use judgment or function independently, and poor ability to behave and relate predictably in social situations. (R. at 49). The ALJ explained that no jobs would be available to such a person. (R. at 49). Plaintiff's attorney followed, asking the vocational expert whether a person who consistently missed four days of work per month would be able to maintain employment. (R. at 49). The vocational expert responded in the negative. (R. at 49). Plaintiff's attorney then asked whether there were any workplace tolerances for altercations with superiors. (R. at 49). The vocational expert stated that one verbal altercation might be tolerated. (R. at 49 – 50).

### 6. Administrative Decision

In her written disability decision of January 27, 2012, the ALJ believed that Plaintiff had not been under a disability – as defined by the Act – from June 29, 2009 through the date of her administrative decision. (R. at 23). In a rather conclusory fashion, she dismissed the possibility of migraine headaches as a severe impairment, because Plaintiff's headaches were "under control," and did not impose "any significant limitations." (R. at 14, 18). Following a brief recitation of Plaintiff's personal history and complaints, the ALJ found that the remainder of Plaintiff's physical conditions did not contribute to a disabling level of limitation. (R. at 17 – 18, 20). Without providing specific examples from the factual record to bolster her conclusions, the ALJ then declined to attribute significant weight to the functional assessment findings of Dr. Davuluri and Dr. Meadows, because Plaintiff was psychologically stable with treatment. (R. at 20 – 21). Rather, the ALJ assigned great weight to the findings of state agency evaluators based

on her cursory explanation that said evaluators' functionality findings were "substantiated by the record as a whole." (R. at 21).

**B.    ANALYSIS**

**1. Standard of Review**

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[6], 1383(c)(3)[7]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The

---

[6]     Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[7]     Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

## 2. Discussion

Based upon the medical record in this case, the ALJ determined that Plaintiff suffered severe impairments in the way of affective disorder, anxiety related disorder, hepatitis C, obesity, knee pain, and seizures. (R. at 14). As a direct result of said impairments, the ALJ determined that Plaintiff would be limited to work involving only simple, routine, repetitive tasks, no fast pace production-rate requirements, only simple work-related decisions, only routine work changes, no public contact, only occasional contact with supervisors and co-workers, only occasional use of ramps and stairs, no climbing of ropes or scaffolds, and no exposure to unprotected heights and moving machinery. (R. at 15). Based upon the testimony of the vocational expert, the ALJ concluded that in spite of experiencing said limitations, Plaintiff would still be eligible for employment in a significant number of positions in existence in the national economy, including past relevant work. (R. at 21 – 23). Plaintiff, therefore, was not found to be entitled to DIB or SSI. (R. at 23).

Plaintiff objects to this decision by the ALJ, arguing that she committed error by failing to give controlling weight to the mental health limitations findings of Dr. Meadows, and by failing to give full consideration to Dr. Davuluri's findings with respect to her migraine headache pain. (ECF No. 12 at 7 – 17). Defendant counters that the findings of Drs. Meadows and

Davuluri were not supported by objective medical evidence, and that the ALJ accorded these physicians' opinions appropriate weight. (ECF No. 17 at 11 – 17). The Court agrees with Plaintiff.

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ failed to meet this standard.

Plaintiff's main points of contention focus upon the ALJ's minimal discussion of the factual record, particularly as it pertains to specific impairment and limitations findings by Drs. Meadows and Davuluri. With respect to the functional capacity assessment completed by Dr. Meadows, the ALJ acknowledges the rather severe limitations listed therein. (R. at 19). The ALJ rejected said findings, stating that "[s]ubsequent treatment records . . . show that the claimant has missed several outpatient sessions; however, with treatment including therapy and medications, the claimant's condition was stable." (R. at 19). The ALJ also noted Plaintiff's conservative care and lack of psychiatric hospitalizations as evidence of a lack of disability. (R. at 20).

However, the ALJ failed to point to any specific evidence to refute the express findings of Dr. Meadows, one of Plaintiff's treating psychiatrists at Western Psych. Further, as noted by

Plaintiff, no mental health specialist – at any point – indicated that Plaintiff's mental state was "stable." While her mental state obviously deteriorated during periods when she did not strictly adhere to her medication regimen, or when she did not consistently attend treatment, there was no evidence from any treating source that while in treatment, Plaintiff was "functionally stable." In fact, two specific occurrences in the record demonstrated otherwise. The ALJ neglected to mention Plaintiff's pending criminal charges for an outburst related to a manic phase of her depressive disorder. She also failed to discuss Plaintiff's recommended enrollment in an intensive outpatient program at Western Psych due to difficulty controlling her bipolar disorder.

"This court has recognized that there is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." *Cotter v. Harris*, 642 F. 2d at 706. While it is understood that the ALJ is required to analyze and choose between conflicting medical accounts – and that the ALJ's findings are not expected to be as rigorous as the analyses of a medical professional or scientist – if the ALJ has not adequately explained his or her treatment of obviously probative evidence, the court cannot say whether substantial evidence supports an ALJ's conclusion. *Id.* at 705 (citing *Dobrowolsky v. Califano*, 606 F. 2d 403, 407 (3d Cir. 1979) ("the special nature of proceedings for disability benefits dictates extra care on the part of the agency in . . . explicitly weighing all evidence")). The ALJ cannot reject probative evidence for "no reason or for the wrong reason." *Morales v. Apfel*, 255 F. 3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F. 2d 1058, 1066 (3d Cir. 1993)). The ALJ's decision should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli v. Massanari*, 247 F. 3d 34, 42 (3d Cir. 2001).

The ALJ attempts to discredit Plaintiff's treating physicians by claiming that their statements are merely conclusory and unsupported by evidence. (R. at 19 – 21). However, the ALJ's scant discussion of specific evidence from Plaintiff's treatment notes was no different. It certainly did not rise to the level of substantial evidence. To conclude that such an opinion is supported by substantial evidence "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Stewart v. Sec'y of Health, Educ. and Welfare*, 714 F. 2d 287, 290 (3d Cir. 1983) (quoting *Arnold v. Sec'y of Health, Educ. and Welfare*, 567 F. 2d 258, 259 (4th Cir. 1977)).

Similarly, the findings of Dr. Davuluri, Plaintiff's primary care physician, did not receive adequate discussion. There was significant evidence regarding pain suffered by Plaintiff as a result of migraine headaches. The ALJ did not discuss any specific treatment note regarding Plaintiff's migraines. She also failed to note that while hospitalized for seizures, Plaintiff's migraines were considered to be poorly controlled. While treatment notes showed that with medication, Plaintiff experienced some improvement, the degree of improvement was not indicated, and no treating source indicated that the migraines were well controlled. Throughout the treatment record, Dr. Kumari consistently noted that Plaintiff experienced significant headache pain on a weekly basis. Once again, the ALJ's consideration and analysis of this portion of Plaintiff's medical record is lacking.

Additionally, while the ALJ gave great weight to the findings of the state agency evaluators in an attempt to bolster her decision, she also failed to provide specific evidence to indicate why the opinions of non-treating evaluators were entitled to such consideration. Neither evaluator made explicit reference to specific facts from the record, and provided almost no narrative to justify their conclusions. Again, while the ALJ faulted Plaintiff's treating sources

for failing to provide more than conclusory statements to substantiate their findings, there is no evidence to suggest that the consultative examiners did anything more.

The ALJ also attempted to discredit Plaintiff's claimed inability to work by citing to her ability to clean, maintain social contacts, do laundry, shop, watch movies, listen to music, take care of a cat, prepare meals, iron, walk, ride in a car, use transit, assist her grandmother, and care for her daughter. (R. at 20). As to this point, the Court is compelled to note that "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith v. Califano*, 637 F. 2d 968, 971 (3d Cir. 1981). Furthermore, in discussing Plaintiff's activities of daily living, the ALJ failed to mention the rigor or frequency of these activities as performed by Plaintiff. Her testimony at the administrative hearing – while indicative of some ability to engage in these activities – painted her activities of daily living as starkly minimal. "[S]poradic or transitory activity does not disprove disability." *Id*. at 971 – 72. In order to discredit Plaintiff's subjective testimony, the ALJ must actually present evidence which contradicts her statements. Parroting that Plaintiff is capable of doing activities which she has already admitted that she does, but with minimal effectiveness, is not sufficient for this purpose.

## C.    CONCLUSION

Based upon the foregoing, the ALJ failed to provide substantial evidence to justify her decision as it pertained to the medical evaluations and functional capacity assessments of Dr. Meadows and Dr. Davuluri, both treating physicians. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (ECF No. 11) be granted, to the extent remand for reconsideration is sought, and denied, to the extent reversal and an immediate award of benefits is sought. It is further recommended that Defendant's Motion for Summary

Judgment (ECF No. 16) be denied, and the decision of the ALJ be vacated and remanded for further thorough consideration consistent with this Report and Recommendation.

"On remand, the ALJ shall fully develop the record and explain [his or her] findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F. 3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 432 (W.D. Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

In accordance with the Magistrate Judges Act, 28 U.S.C. 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

<u>s/ Maureen P. Kelly</u>
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE


Dated: August 21, 2013

cc/ecf: All counsel of record.